# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JASON LEOPOLD and<br>RYAN NOAH SHAPIRO,<br><br>     Plaintiffs,<br><br>     v.<br><br>DEPARTMENT OF JUSTICE and<br>DEPARTMENT OF HOMELAND<br>SECURITY,<br><br>     Defendants. | Civil Action No. 16-1827 (BAH)<br><br>Chief Judge Beryl A. Howell |

### MEMORANDUM OPINION

The plaintiffs, Jason Leopold, an investigative reporter, and Ryan Noah Shapiro, "an

historian of national security, the policing of dissent, and governmental transparency," First Am.

Compl. ("FAC") ¶¶ 1–2, ECF No. 4, challenge the responses of the Federal Bureau of

Investigation ("FBI"), a component of the Department of Justice ("DOJ"), and the Secret

Service, a component of the Department of Homeland Security, to their four records requests

submitted pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.[1]  The FOIA

requests at issue seek information about "how" the FBI and Secret Service "referenced or

discussed internally," Pls.' Mem. Supp. Cross-Mot. Summ. J. & Opp'n Defs.' Mot. Summ. J.

("Pls.' Opp'n") at 2, ECF No. 22-1, two statements made in July and August 2016 by then-

Republican presidential candidate Donald Trump, and a third statement made in July 2016 by a

New Hampshire state legislator.  These statements, in the plaintiffs' view, "arguably crossed the

---

[1] The complaint originally challenged the response of the Internal Revenue Service (IRS) to a fifth FOIA request, but the plaintiffs subsequently voluntarily dismissed the claim against the IRS.  *See* Pls.' Notice of Voluntary Dismissal, ECF No. 10.

line between free speech and inciting imminent unlawful action." *Id.* at 1.  The parties have now cross-moved for summary judgment.  Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 18; Pls.' Cross-Mot. Summ. J. & Opp'n Defs.' Mot. Summ. J. ("Pls.' Cross-Mot."), ECF No. 22.  For the reasons set forth below, the defendants' motion is granted and the plaintiffs' cross-motion is denied.

## I.  BACKGROUND

A news article published on July 20, 2016, attributed to a New Hampshire legislator, Alfred P. Baldasaro, the following statement: "Hillary Clinton should be put in the firing line and shot for Treason."  Defs.' Statement of Material Facts as to Which There is No Genuine Issue ("Defs.' SMF") ¶ 23 (citing Asawin Suebsaeng, *Secret Service Investigating Trump Adviser Al Baldasaro for Hillary Execution Comments*, THE DAILY BEAST (July 20, 2016), https://www.thedailybeast.com/secret-service-investigating-trump-adviser-al-baldasaro-for-hillary-execution-comments), ECF No. 18-1.[2]  This statement purportedly urging the shooting of a Democratic presidential candidate prompted the U.S. Secret Service Spokesperson Robert Hoback to give the following statement to the *Daily Beast*: "The U.S. Secret Service is aware of this matter and will conduct the appropriate investigation."  *Id.* ¶¶ 22–23.

The following week, on July 27, 2016, then-candidate Trump stated: "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing," and, "I think you will probably be rewarded mightily by our press."  FAC ¶ 17.  Two weeks later, on August 9, 2016, then-candidate Trump made what the plaintiffs' characterize as an "astonishing statement" that "was a thinly veiled threat on Secretary Clinton's life," Pls.' Opp'n at 1, that "[i]f she gets to pick her judges, nothing you can do, folks," and, "[a]lthough the Second Amendment people —

---

[2]      The facts set forth in the defendants' Statement of Material Facts as to Which There is No Genuine Issue are undisputed.  *See* Pls.' Resp. To Defs.' SMF, ECF No. 21-1.

maybe there is, I don't know." FAC ¶ 16. Similarly to the Secret Service's earlier response to the state legislator's statement urging the shooting of the Democratic presidential candidate, the Secret Service responded to Trump's statement on the same day, stating in an official Tweet: "The Secret Service is aware of the comments made earlier this afternoon." Defs.' SMF ¶ 24 (emphasis omitted). By contrast, however, to the Secret Service's earlier response to the New Hampshire legislator's statement, the Secret Service's response to the Trump statement did not indicate that the agency would conduct any investigation.

These provocative statements by the Republican presidential candidate and a state legislator prompted the plaintiffs, on August 18, 2016, to submit, by separate emails, two FOIA requests to the FBI and two FOIA requests to the Secret Service. FAC ¶¶ 23–25, 30–32; Defs.' SMF ¶¶ 1–2, 22, 24. The plaintiffs explain that "[b]ecause these statements could be viewed as illegal incitement, they would likely have at least piqued the interest of federal law enforcement agencies if made by an ordinary citizen," and the FOIA requests were intended to obtain records regarding how "federal law enforcement agencies react to such statements from a major political party's candidate for President" and "convey their response or lack thereof to the public." Pls.' Opp'n at 1.

The responses by each agency are described below.

A.    **FBI'S RESPONSE TO PLAINTIFFS' FOIA REQUESTS**

The plaintiffs' FOIA requests to the FBI seek: (1) "disclosure of any and all records, including investigative records, mentioning or referring to Donald J. Trump's statements on 9 August 2016, 'If she gets to pick her judges, nothing you can do folks,' and 'Although the Second Amendment people – maybe there is, I don't know,'" ("Second Amendment Request"), Defs.' SMF ¶1 (quoting Defs.' Mot., Attach. 5, Decl. of David M. Hardy, Section Chief of Records Management Division (FBI), dated July 26, 2017 ("Hardy Decl.") ¶ 5, ECF No. 18-5);

3

and (2) "disclosure of any and all records, including investigative records, mentioning or referring to Donald J. Trump's statement on 27 July 2016, 'Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing,' and 'I think you will probably be rewarded mightily by our press,'" ("Russia Reward Request"), *id.* ¶2 (quoting Hardy Decl. ¶ 5).[3]

Relying on FOIA Exemptions 7(A) and 7(E), 5 U.S.C. §§ 552(b)(7)(A) & (E), the FBI, on November 18, 2016, issued *Glomar* responses, indicating the agency could "neither confirm nor deny the existence of records responsive" to either request. *Id.* ¶ 3–6 (quoting Hardy Decl. ¶¶ 7–8).[4] A few months later, however, on March 20, 2017, then-FBI director James Comey publicly acknowledged for the first time in congressional testimony an ongoing FBI counterintelligence investigation into "the Russian government's efforts to interfere in the 2016 presidential election and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts." *Id.* ¶ 7 (quoting Hardy Decl. ¶ 9).

In light of the then-FBI Director's confirmation of an investigation, and interpreting the Russia Reward Request as seeking "records from the investigation that Director Comey acknowledged on March 20, 2017," the FBI withdrew "its *Glomar* response, and is now relying on FOIA Exemption (b)(7)(A) to withhold in full, on a categorical basis, all records responsive to the" Russia Reward Request. *Id.* ¶ 9 (citing Hardy Decl. ¶ 11). The FBI construed the Russia Reward Request to cover "all records from the relevant investigative files (which are now part of Special Counsel Mueller's Russia investigation)," and therefore "assum[ed] that the universe of

---

[3]    Although each exhibit and submission from the parties has been reviewed, only those exhibits necessary to provide context for resolution of the instant motion are cited herein.

[4]    A "*Glomar*" response that the agency can neither confirm nor deny the existence or non-existence of responsive records is named after the vessel, the *Hughes Glomar Explorer,* that was the subject of a FOIA request for records in *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976).

responsive records is co-extensive with the contents of the investigative files as they existed on March 20, 2017." Hardy Decl. ¶ 29. The search of the "relevant investigative files" by counsel from the FBI's National Security and Cyber Law Branch "confirmed that all records responsive to Plaintiffs' request" are part of the Special Counsel's investigation, and served as the basis for the FBI's invocation of Exemption 7(A). *Id.* ¶¶ 30–31.

The FBI's *Glomar* response to the Second Amendment Request relies on Exemptions 7(A) and 7(E). Defs.' SMF ¶ 4. The FBI explains that Exemption 7(A) is implicated because declaring "the existence or non-existence of any records responsive to the Second Amendment Request" would effectively acknowledge the existence or non-existence of "a pending investigation it has not previously acknowledged, and that, assuming such an investigation existed, 'acknowledging its existence prematurely could reasonably be expected to hamper and interfere with it.'" *Id.* ¶ 12 (quoting Hardy Decl. ¶ 19). Similarly, the FBI invokes Exemption 7(E), explaining that confirming the existence or non-existence of a previously unacknowledged investigation "would expose information about the types of statements, actions, allegations, or threats the FBI deems appropriate to commit (or not commit) investigative resources toward," thereby providing "significant insight into the activities likely to attract (or not attract) the FBI's law enforcement attention," which insight could facilitate circumvention of the law without drawing the FBI's notice. *Id.* ¶ 13 (quoting Hardy Decl. ¶ 24).

## B. SECRET SERVICE'S RESPONSE TO PLAINTIFFS' FOIA REQUESTS

The plaintiffs' FOIA requests to the Secret Service sought records regarding the agency's public statements in response to the statement by the New Hampshire legislator urging the shooting of the Democratic presidential candidate and Trump's "Second Amendment people" statement. FAC ¶¶ 30–32; Defs.' SMF ¶¶ 22, 24. Specifically, the request regarding the New Hampshire legislator urging the shooting of the Democratic presidential candidate, stated that

5

"On 20 July 2016, U.S. Secret Service Spokesperson Robert Hoback gave the following statement to the *Daily Beast*: 'The U.S. Secret Service is aware of this matter and will conduct the appropriate investigation,'" and requested "disclosure of any and all records that mention or refer to the matter," along with "any records compiled as part of any investigation into the referenced matter."  Defs.' SMF ¶ 22 (citing Defs.' Mot., Attach. 6, Decl. of Kim E. Campbell, Special Agent in Charge of Secret Service FOIA Division, dated July 12, 2017 ("Campbell Decl.") ¶ 4, ECF No. 18-6).  The plaintiffs' other request to the Secret Service stated that "On 9 August 2016, the U.S. Secret Service tweeted the following message: *The Secret Service is aware of the comments made earlier this afternoon*," and requested "disclosure of any and all records that mention or refer to these comments," along with "any records compiled as part of any investigation into the referenced comments."  *Id.* ¶ 24 (citing Campbell Decl. ¶ 3) (emphasis in original).

The Secret Service interpreted the first request as seeking information regarding the agency's response to "comments that had been attributed to Alfred P. Baldasaro, a member of the New Hampshire House of Representatives: 'Hillary Clinton should be put in the firing line and shot for Treason,'" *id.* ¶23 (citing Campbell Decl. ¶ 4), and the second request as referring to Trump's "Second Amendment people" statement, *id.* ¶ 24 (citing Campbell Decl. ¶ 3). Following a search of "all locations likely to contain responsive records," *id.* ¶ 25 (citing Campbell Decl. ¶ 7), and a "line by line [examination], to identify non-exempt information that could be reasonably segregated from exempt information for release," *id.* ¶ 36 (citing Campbell Decl. ¶ 21), the Secret Service, on or before February 17, 2017, produced "268 pages of responsive records, most of them in partially redacted form," *id.* ¶ 27 (citing Campbell Decl. ¶¶ 7–8).  The Secret Service withheld information reflected in the partial redactions pursuant to

FOIA Exemptions 5, 6, 7(C), and 7(E). *Id.* ¶ 28 (citing Campbell Decl. ¶ 8). While not disputing the adequacy of the Secret Service's search or withholdings under Exemptions 6 or 7(C), the plaintiffs dispute the redactions on 41 pages under Exemptions 5 and 7(E).[5]

As urged by the plaintiffs, *see* Pls.' Reply Supp. Cross-Mot. Summ. J. ("Pls.' Reply") at 22, ECF No. 27, the Court ordered the Secret Service to submit for *in camera* inspection the disputed redacted pages, *see* Minute Order, February 5, 2018.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (quoting *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006)) (alteration adopted). Indeed, the D.C. Circuit has observed that "the vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).

The FOIA was enacted "to promote the 'broad disclosure of Government records' by generally requiring federal agencies to make their records available to the public on request." *DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015) (quoting *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)). Reflecting the necessary balance between the public's interest in

---

[5]    The disputed pages have the following Bates-stamp numbers: 10, 101, 135, 148–51, 156–58, 165–66, 168–69, 171, 174–75, 177, 179, 180–81, 183, 185, 187, 189, 195, 208–10, 212–13, 226, 228–29, 231, 233–36, 243, and 252. Defs.' SMF ¶ 31; Pls.' Opp'n at 16 n.7 (withdrawing challenge to withholdings on pages 163, 217, 225, 237–39, and 250); *see also* Defs.' Opp'n Cross-Mot. Summ. J. & Reply Supp. Defs.' Mot. at 25 n.11, ECF No. 23.

governmental transparency and "legitimate governmental and private interests that could be harmed by release of certain types of information," *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010) (quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc) (alterations omitted)), the FOIA contains nine exemptions, set forth in 5 U.S.C. § 552(b), which "are explicitly made exclusive and must be narrowly construed," *Milner v. U.S. Dep't of Navy*, 562 U.S. 562, 565 (2011) (internal quotation marks and citations omitted); *see also Murphy v. Exec. Office for U.S. Attys.*, 789 F.3d 204, 206 (D.C. Cir. 2015); *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW*"), 746 F.3d 1082, 1088 (D.C. Cir. 2014); *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010). "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose,* 425 U.S. 352, 361 (1976).

In litigation challenging the sufficiency of "the release of information under the FOIA, 'the agency has the burden of showing that requested information comes within a FOIA exemption.'" *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 185 F.3d 898, 904 (D.C. Cir. 1999) (quoting *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999)); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) (noting that "[t]he Government bears the burden of establishing that the exemption applies"); *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979) (finding that the agency invoking an exemption bears the burden "to establish that the requested information is exempt"); *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014). This burden does not shift even when the requester files a cross-motion for summary judgment because "the Government 'ultimately [has] the onus of proving that the [documents] are exempt

from disclosure,'" while the "burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur,'" *Pub. Citizen Health Research Grp.*, 185 F.3d at 904–05 (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)) (alterations in original).

An agency may carry its burden of showing an exemption was properly invoked by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld and provided sufficient information as to the applicability of an exemption to enable the adversary system to operate. *See Judicial Watch, Inc.*, 726 F.3d at 215 ("In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" (quoting *Consumer Fed'n of Am.*, 455 F.3d at 287) (alteration adopted)); *CREW*, 746 F.3d at 1088 (noting that an agency's burden is sustained by submitting an affidavit that "describe[s] the justifications for nondisclosure with reasonably specific detail, demonstrate[s] that the information withheld logically falls within the claimed exemption, and [is] not controverted by either contrary evidence in the record nor by evidence of agency bad faith" (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009))); *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) (instructing that an agency's description "should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection[,] . . . [which] serves the purpose of providing the requestor with a realistic opportunity to challenge the agency's decision." (internal citation omitted)). While "an agency's task is not herculean" it must "'describe the justifications for nondisclosure with reasonably

specific detail' and 'demonstrate that the information withheld logically falls within the claimed exemption.'" *Murphy*, 789 F.3d at 209 (quoting *Larson*, 565 F.3d at 862). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)); *Larson*, 565 F.3d at 862 (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

The FOIA provides federal courts with the power to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). District courts must "determine *de novo* whether non-disclosure was permissible," *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015), by reviewing the *Vaughn* index and any supporting declarations "to verify the validity of each claimed exemption," *Summers v. U.S. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998).

In addition, the court has an "affirmative duty" to consider whether the agency has produced all segregable, non-exempt information. *Elliott v. U.S. Dep't of Agric.*, 596 F.3d 842, 851 (D.C. Cir. 2010) (referring to court's "affirmative duty to consider the segregability issue *sua sponte*" (quoting *Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007))); *Stolt–Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) ("[B]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007))); *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999) ("[W]e believe that the District Court had an affirmative duty to consider the segregability issue *sua sponte* . . . even if the issue has not been specifically raised

by the FOIA plaintiff."); *see also* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").

## III.  DISCUSSION

The plaintiffs challenge aspects of the responses of both the FBI and the Secret Service to their four FOIA requests, as discussed below.

### A.  THE FBI CONDUCTED AN ADEQUATE SEARCH AND PROPERLY WITHHELD RECORDS

The FBI released no records in response to either of the plaintiffs' FOIA requests, invoking Exemption 7(A) as to the Russia Reward Request and a *Glomar* response, predicated on Exemptions 7(A) and 7(E), as to the Second Amendment Request. The plaintiffs contend that the FBI conducted an inadequate search for records responsive to both requests, due to the FBI's construction of the requests as seeking only investigative records, and improperly withheld records.

#### 1.  *The Russia Reward Request*

The crux of the plaintiffs' dispute over the FBI's response to the Russia Reward Request stems from the FBI's construction of this request: namely, the FBI, as a law enforcement agency, interpreted the plaintiffs' request as seeking "the sort of records that the FBI was likely to have (if any)." Defs.' Opp'n Cross-Mot. Summ. J. & Reply Supp. Defs.' Mot. ("Defs.' Opp'n") at 5, ECF No. 23. Consequently, the FBI searched "for only investigative records," *id.* (quoting Ex. A, Second Decl. of David M. Hardy, dated Sept. 19, 2017 ("Second Hardy Decl.") ¶ 6, ECF No. 23-3), "coextensive with the FBI's Russia investigation (at least, as it stood on the search cut-off date of March 20, 2017), *id.* at 9. This active and ongoing investigation is now being supervised by Special Counsel Robert S. Mueller, III. *See* Hardy Decl. ¶¶ 27, 31–32. The plaintiffs

complain that this "construction is both broader and narrower than Plaintiffs' request." Pls.' Opp'n at 2; Pls.' Reply at 4 (complaining that the FBI did not process the "Russia request consistent with how it is written"). Contrary to the plaintiffs' position, the FBI reasonably interpreted the Russia Reward Request.

As the plaintiffs correctly point out, "[a]gencies have 'a duty to construe a FOIA request liberally,'" *People for the Ethical Treatment of Animals v. Nat'l Institutes of Health, Dep't of Health & Human Servs.* ("*PETA*"), 745 F.3d 535, 540 (D.C. Cir. 2014) (quoting *Nation Magazine, Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995)), but that duty does not obviate the requester's burden to "'reasonably describe[ ]' the records sought," *Nation Magazine*, 71 F.3d at 890 (quoting 5 U.S.C. § 552(a)(3)) (alteration in original). "The linchpin inquiry is whether the agency is able to determine precisely what records [are] being requested," *Yeager v. DEA*, 678 F.2d 315, 326 (D.C. Cir. 1982) (internal quotation marks omitted), with the responsibility firmly on the requester "to frame requests with sufficient particularity to ensure that searches are not unreasonably burdensome," *Assassination Archives & Research Ctr., Inc. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989), *aff'd*, No. 89-5414, 1990 U.S. App. LEXIS 27799 (D.C. Cir. Aug. 13, 1990) (citing *Yeager*, 678 F.2d 315). Moreover, agencies "are not required to . . . perform searches which are not compatible with their own document retrieval systems," *id.*, and they "need not respond to overly broad and unreasonably burdensome requests," *Judicial Watch, Inc. v. U.S. Dep't of State*, 681 F. App'x 2, 4 (D.C. Cir. 2017) (citing *Am. Fed'n of Gov't Emps. v. U.S. Dep't of Commerce*, 907 F.2d 203, 208–09 (D.C. Cir. 1990)); *see also Anderson v. U.S. Dep't of State*, 661 F. Supp. 2d 6, 12 n.3 (D.D.C. 2009) (an agency does not have to "honor a FOIA request that requires it to conduct an unduly burdensome search" (quoting *Pub. Citizen, Inc. v. U.S. Dep't of Ed.*, 292 F.Supp.2d 1, 6 (D.D.C.

2003))).  When confronted with a challenge to the adequacy of a search, "an 'agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested,' which it can do by submitting '[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'"  *Reporters Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017) (quoting *Oglesby*, 920 F.2d at 68) (alteration in original).

In the plaintiffs' view, the FBI's interpretation of the Russia Reward Request was too narrow since the reference in the request to "investigative files" was prefaced by the word "including," and thereby indicated that the "request was not limited solely to investigative files and thus would include records beyond Special Counsel Muller's [sic] investigative files."  Pls.' Opp'n at 3.  The FBI does not dispute that, "taken literally and divorced from context, the plain text of these requests, standing alone, would call for non-investigative records (to the extent they exist)."  Defs.' Opp'n at 4.  Yet, the FBI has credibly explained that such a literal construction of this request "as seeking more than law enforcement records" would be "overly broad, unduly burdensome, and inadequate to describe the records sought," such that the FBI "would have been unable to craft a reasonable search for such non-investigative records."  Second Hardy Decl. ¶ 8. Indeed, FOIA requests with similarly broad phrasing as the plaintiffs' request for "any and all records . . . mentioning or referring to" Trump's Russia Reward statement, Defs.' SMF ¶ 2, without any more specification of targeted locations or more particularity have been found "fatally overbroad and burdensome," *Freedom Watch, Inc. v. U.S. Dep't of State*, 925 F. Supp. 2d 55, 61 (D.D.C. 2013) (granting summary judgment to agency confronted with FOIA request for "'all' records that 'relate to'" a subject); *see also Cable News Network, Inc. v. FBI*, 271 F.

Supp. 3d 108, 110, 112 (D.D.C. 2017) (holding that a request for "[a]ny and all documents and records" relating to memoranda written by former FBI Director Comey was fatally overbroad); *Dale v. IRS*, 238 F. Supp. 2d 99, 104 (D.D.C. 2002) (finding FOIA request for "any and all documents, including but not limited to files, that refer or relate in any way to" an individual did "not describe the records sought with 'reasonably sufficient detail' in light of both statutory guidance and case law").

For example, the plaintiffs criticize the FBI for not "look[ing] for noninvestigative records within its Central Records System (CRS)," Pls.' Reply at 4, or in other possible locations such as "within the FBI's Office of Public Affairs (responding to questions from reporters); senior leadership (discussing the matters internally); and the FBI's Moscow overseas office (with respect to the Russia request)," *id.* at 3. This criticism, however, only proves the FBI's point. At the outset, a CRS search is typically used for "investigative, law-enforcement records," Second Hardy Decl. ¶ 8, not the non-investigative records that the plaintiffs apparently had in mind. In any event, a search of CRS "was not necessary in this case because the responsive records were located by other means." Hardy Decl. ¶ 30. Specifically, subject matter experts from the National Security and Cyber Law Branch ("NSCLB") of the FBI's Office of General Counsel ("OGC"), "who were already familiar with the relevant records," *id.*, were called upon to conduct a "manual search and review of the entirety of the relevant investigative files" before "confirm[ing]" that all responsive records were now part of the Special Counsel's investigation, *id.* ¶ 31.

Moreover, the plaintiffs' suggested non-exhaustive list of potential locations for searches illustrates the broad scope of the request as to non-investigative records without providing "a sufficient description of the records sought to permit a search." Second Hardy Decl. ¶ 8. As the

defendants explain, "[d]ivorced from the context of the FBI's investigative, law enforcement functions, literally any one of the FBI's more than 35,000 employees might have had an email mentioning one of the campaign comments in question," but "'[w]ithout identified (or even described) employee-custodians, the FBI cannot conduct e-mail or electronic searches'" due to technical search limitations within the agency. Defs.' Opp'n at 5–6 (quoting Second Hardy Decl. ¶ 8); *see also* Second Hardy Decl. ¶ 8 ("[I]t is simply not reasonable (or even feasible) to ask *every* FBI office and the more than 35,000 employees of the FBI to conduct searches for some unspecified, non-investigative records, unrelated to the FBI's law-enforcement mission, which may or may not exist, about two comments made by a Presidential candidate." (emphasis in original)); Defs.' Opp'n at 6 (noting that plaintiffs' request for non-investigative records is so broad and non-specific that it is beyond the FBI's "technical capability" (quoting Second Hardy Decl. 8)).[6]

Even if the FBI's interpretation of their request as "seeking all records from the relevant investigative files" of Special Counsel Mueller, Hardy Decl. ¶ 29, was "a reasonable one," the plaintiffs assert that the FBI nonetheless lacked authority to apply a "saving construction" of the request "without prior notice or permission from Plaintiffs," Pls.' Reply at 1–2. Absent such prior notice of the FBI's otherwise concededly "reasonable" interpretation, the plaintiffs "seek an order . . . requiring the FBI to process the Russia request as written." *Id.* at 9. The plaintiffs'

---

[6]     The plaintiffs rely on "cases within this Circuit [that] have often disapproved of agencies narrowing the scope of a FOIA request to exclude materials reasonably within the description provided by the requester," Pls.' Reply at 1 (quoting *Nat'l Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 102 (D.D.C. 2013)), but this reliance is misplaced. The plaintiffs cite, for example, *LaCedra v. Exec. Office for U.S. Attorneys*, 317 F.3d 345, 346–47 (D.C. Cir. 2003), where the court concluded that the agency improperly narrowed a request for "all documents pertaining to" plaintiff's criminal case to "only the specifically enumerated items." By contrast to such cases in which an agency improperly narrows an otherwise clear FOIA request and thereby improperly delimits the search, here the FBI necessarily narrowed the scope of the Russia Reward Request to "only investigative records" because a more expansive reading to cover non-investigative records "would have prevented the FBI from being able to conduct an adequate search." Defs.' Mem. Supp. Defs.' Mot at 21, ECF No. 18-2.

invitation to impose an obligation on agencies to provide notice and/or to confer with a requester before construing an otherwise fatally overbroad request in a manner to which a response may be provided, is declined. As support, the plaintiffs cite to 28 C.F.R. § 16.3(b), which directs DOJ components to clarify FOIA requests with requestors if the request "does not reasonably describe the records sought." This regulation is unavailing, however. This regulation is inapplicable since the Russia Reward Request's reference to "investigative records" provided a reasonable description of the records sought and allowed the FBI to limit the scope of the request to a reasonably manageable search, avoiding the need to trigger any conferral obligation under the cited regulation. Moreover, even if the regulation were applicable and the FBI had made an effort to confer with the plaintiffs to narrow the scope of their Russia Reward Request, the plaintiffs' posture in this litigation in continuing to seek non-investigative records indicates that any such conferral would have been futile. Thus, while the law is clear that FOIA requests must be liberally construed, this obligation is limited by the agency's ability to identify the locations where the requested records may be located and the concomitant administrative burdens of conducting the search with available search tools.

The plaintiffs further complain that the FBI's construction of their Russia Reward request was too broad because "Special Counsel Muller's [sic] investigative file would include documents that do not 'mention[] or refer[]' to Mr. Trump's statement about Secretary Clinton's emails." Pls.' Opp'n at 2–3 (alterations in original). As the plaintiffs explain, their request was drafted "so as to obtain records about the FBI's response to a public call for a foreign government to violate United States law, not to obtain any and every record about the Trump campaign's potential collusion with Russia (i.e., the documents now contained in Muller's [sic] investigative file)." Pls.' Opp'n at 4. The plaintiffs' critique that the FBI's interpretation of the

Russia Reward Request as co-extensive with the Special Counsel's investigative files is over-

broad may be accurate, but that observation does not help the plaintiffs. As the defendants note,

this overbroad interpretation of the request "would [not] have actually missed any [responsive]

documents." Defs.' Opp'n at 9 (citing *Hemenway v. Hughes*, 601 F. Supp. 1002, 1005 (D.D.C.

1985). Whether the FBI categorically withholds all materials that are part of the Special

Counsel's investigation, or just the subset that "mention[] or refer[] to" Trump's statement,

Hardy Decl. ¶ 5, makes no difference in the applicability of Exemption 7(A), Defs.' Opp'n at 9–

10.

FOIA's Exemption 7(A) allows an agency to withhold "records or information compiled

for law enforcement purposes," but only to the extent that the production of such records or

information "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C.

§ 552(b)(7)(A). In adopting this exemption, Congress recognized that "law enforcement

agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be

hindered in their investigations or placed at a disadvantage when it [comes] time to present their

case." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978). In this case, the FBI has

amply established that the investigative materials now part of the Special Counsel's investigation

were "compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7), and are "part of an active,

ongoing counterintelligence investigation," Hardy Decl. ¶ 32, such that production of these

records "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. §

552(b)(7)(A). As the agency's declarant explains, disclosure of any specific records "would

reveal non-public information about the nature and scope of the pending investigation, the extent

to and manner in which the comment fit within (or was deemed irrelevant to) the larger

investigation as a whole (if at all), the relative significance of the comment (or lack thereof) to the investigation, and so on." Second Hardy Decl. ¶ 10.

Although the plaintiffs apparently contest the applicability of Exemption 7(A), *see* Pls.' Reply at 9–10 (stating that "Plaintiffs' response should not be understood as a concession that the assertion of Exemption 7(A) is proper"), the focus of their dissatisfaction is with the FBI's blanket invocation of this exemption without "conduct[ing] a document-by-document review in order to assign documents to the proper category," *id.* at 5 (quoting *Bevis v. U.S. Dep't of State*, 801 F.2d 1386, 1389 (D.C. Cir. 1986)). The plaintiffs' characterization is contrary to the description provided by the FBI about how the search was conducted. Specifically, the FBI had subject matter experts from the NSCLB of the FBI's OGC conduct a "manual search and review of the entirety of the relevant investigative files." Hardy Decl. ¶ 31. The agency then withheld records "on a categorical basis," Defs.' Mem. Supp. Defs.' Mot at 24, ECF No. 18-2, because even a *Vaughn* index or other precise description of the records being withheld would "reveal non-public information about the targets and scope of the investigation" which "could reasonably be expected to" interfere with it, Hardy Decl. ¶ 35. In lieu of specific information about each withheld record, the agency describes for each type of responsive record, how disclosure could interfere with the Special Counsel's investigation and any prospective enforcement proceedings. *Id.* ¶¶ 38, 41–51.

In considering the plaintiffs' objection to the manner in which the FBI has invoked Exemption 7(A), the Court is mindful that categorical withholdings under Exemption 7(A) may be appropriate. *See Robbins Tire*, 437 U.S. at 224, 236 (holding that 7(A) allows "certain generic determinations [to] be made" and "that Congress did not intend to prevent the federal courts from determining that, with respect to particular kinds of enforcement proceedings,

disclosure of particular kinds of investigatory records while a case is pending would generally 'interfere with enforcement proceedings'" (quoting 5 U.S.C. § 552(b)(7)(A))); *CREW*, 746 F.3d at 1098 ("Categorical withholding is often appropriate under Exemption 7(A)."); *Manning v. U.S. Dep't of Justice*, 234 F. Supp. 3d 26, 35 (D.D.C. 2017) ("[A] document-by-document approach is not required, however, when invoking Exemption 7(A)."). In this case, the FBI has provided a sufficient explanation, *see* Second Hardy Decl. ¶ 10, to render the categorical withholding permissible. *See Judicial Watch, Inc.*, 726 F.3d at 215 (an affidavit must "contain reasonable specificity of detail rather than merely conclusory statements" to support the categorical use of Exemption 7(A) (quoting *Consumer Fed'n of Am.*, 455 F.3d at 287)); *Bevis*, 801 F.2d at 1389 (holding that an agency may "group[] documents into relevant categories that are sufficiently distinct to allow a court to grasp 'how each . . . category of documents, if disclosed, would interfere with the investigation'" (quoting *Campbell v. U.S. Dep't of Health & Human Services*, 682 F.2d 256, 265 (D.C. Cir. 1982))).[7]

Accordingly, the defendants are entitled to summary judgment with respect to the plaintiffs' Russia Reward Request.

### 2.    *The Second Amendment Request*

The plaintiffs contend that the FBI's *Glomar* response, predicated on Exemptions 7(A) and/or 7(E), to the Second Amendment Request is improper because the FBI has failed to satisfy the requirements of Exemption 7(A) with "evidence that there is a 'concrete prospective law enforcement proceeding.'" Pls.' Reply at 14 (quoting *Carson v. U. S. Dep't of Justice*, 631 F.2d

---

[7]    In light of the "affirmative duty" to consider whether the agency has produced all segregable, non-exempt information, *Elliott*, 596 F.3d at 851 (quoting *Morley*, 508 F.3d at 1123), the Court notes that the FBI, which is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material," *Sussman*, 494 F.3d at 1117, has met its burden by explaining that "given the active and fluid nature of the investigation, the sensitivities of the materials, and the reasonable expectation of harm from premature disclosure of investigative materials here, the FBI has concluded that no non-exempt information exists that can be reasonably segregated and released," Hardy Decl. ¶ 52.

1008, 1018 (D.C. Cir. 1980).[8]  The FBI argues that its *Glomar* response is supported by

Exemption 7(A) because "any responsive records . . . would necessarily relate to an FBI

investigation the existence of which has never been publicly confirmed or denied."  Defs.' Opp'n

at 12.

"In certain cases, merely acknowledging the existence of responsive records would itself

'cause harm cognizable under [a] FOIA exception.'"  *PETA*, 745 F.3d at 540 (quoting *Wolf*, 473

F.3d at 374) (alteration in original).  In such cases, "an agency can issue a *Glomar* response,

refusing to confirm or deny its possession of responsive documents," and "[a] *Glomar* response

is valid 'if the fact of the existence or nonexistence of agency records falls within a FOIA

exemption.'"  *Id.* (quoting *Wolf*, 473 F.3d at 374).  To determine whether acknowledging the

existence or non-existence of responsive records "fits a FOIA exemption, courts apply the

general exemption review standards established in non-*Glomar* cases."  *Wolf*, 473 F.3d at 374;

*accord ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013).  Thus, the agency bears the burden of

showing that the fact of whether it possesses requested records is protected from disclosure under

a FOIA exemption.  *See Wolf*, 473 F.3d at 374.

Exemption 7(A) protects records when disclosure "could reasonably be expected to

interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A), where those proceedings are

"pending or *reasonably anticipated*," *Mapother v. U.S. Dep't of Justice*, 3 F.3d 1533, 1540 (D.C.

Cir. 1993) (emphasis in original).  The plaintiffs, citing *Mapother*, Pls.' Reply at 13, contend that

---

[8]    The plaintiffs also contend that, similarly to their Russia Reward Request, the FBI improperly construed the
Second Amendment Request "as seeking only investigative records."  Pls.' Opp'n at 13 (quoting Hardy Decl. ¶ 19
n.3).  This contention is not persuasive.  The FBI properly construed the plaintiffs' Second Amendment Request for
"any and all records mentioning or referring to" then-candidate Trump's "Second Amendment people" statement as
seeking investigative records since otherwise the request "would be overly broad, unduly burdensome, and
inadequate to describe the records sought," such that "[t]he FBI would have been unable to craft a reasonable search
for such non-investigative records unconnected to the FBI's law-enforcement mission."  Second Hardy Decl. ¶ 8.

the FBI has not shown that such enforcement proceedings are "contemplated," *id.* (quoting *Mapother*, 3 F.3d at 1540), with respect to then-candidate Trump's "Second Amendment people" statement.  Moreover, the plaintiffs assert that "it is conceptually incoherent to premise a *Glomar* response on Exemption 7(A)," because this exemption "'is temporal in nature,' and an agency must show not only 'that the material withheld relates to a concrete prospective law enforcement proceeding,' but also that '[t]he proceeding . . . remain[s] pending at the time of our decision, not only at the time of the initial FOIA request.'"  Pls.' Opp'n at 8 (quoting *CREW*, 746 F.3d at 1097) (alterations in original).

The defendants, however, correctly point out that the relevant inquiry "is not whether the hypothetical investigation is actually pending," but "whether confirming or denying its existence via a substantive FOIA response would cause harm that is protected under" Exemption 7(A).  Defs.' Opp'n at 16.  The agency affidavit sufficiently explains why disclosure of the *Glomar* fact would result in the type of harm Exemption 7(A) protects against.  *See Wolf*, 473 F.3d at 374 ("In determining whether the existence of agency records *vel non* fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases.").  Specifically, requiring the FBI to respond to the Second Amendment Request with a substantive report would effectively reveal whether or not the agency instituted an investigation of then-candidate Trump's "Second Amendment people" comment, which "some interpreted as [] threatening another presidential candidate."  Second Hardy Decl. ¶ 6.  No such investigation of what the plaintiffs describe as "veiled threats made by a major political party's presidential candidate against his opponent," Pls.' Opp'n at 11, has been publicly acknowledged, and any response other than a *Glomar* response would establish the existence or non-existence of an investigation prompted by then-candidate Trump's "Second Amendment people" comment, *see James*

*Madison Project v. U.S. Dep't of Justice*, No. 17-cv-00144, 2018 U.S. Dist. LEXIS 1674 at *7 (D.D.C. Jan. 4, 2018) (granting summary judgment to FBI on assertion of *Glomar* response based on Exemption 7(A) and accepting agency's explanation "that merely acknowledging the existence or non-existence of responsive records in the FBI's files would require the FBI to confirm or deny whether it has and is investigating the alleged dossier and synopsis, either in a separate investigation or as part of its Russian interference investigation, which itself could hamper and interfere with any such investigation" (internal quotation marks omitted)); *Valdez v. U.S. Dep't of Justice*, 474 F. Supp. 2d 128, 133–34 (D.D.C. 2007) (finding that "DEA adequately justified its decision neither to confirm nor deny the existence of responsive records" pertaining to confidential informant who testified at requester's criminal trial by relying on *Glomar* and Exemption 7(A)); *Cozen O'Connor v. U.S. Dep't of Treasury*, 570 F. Supp. 2d 749, 789 (E.D. Pa. 2008) (granting summary judgment to agency on assertion of *Glomar* response based on Exemptions 1 and 7(A), noting that agency "has never publicly revealed that it has opened investigatory evidentiary files on these sixteen organizations nor has it stated that it is actively investigating any one of the sixteen organizations" that were the subject of the FOIA request at issue).

If an investigation related to then-candidate Trump's "Second Amendment people" statement did exist, any confirmation in response to the plaintiffs' FOIA request "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A), because disclosure "would tip off subjects and persons of investigative interest, thus giving them the opportunity to take defensive actions to conceal their criminal activities, elude detection, and suppress and/or fabricate evidence. It would also expose any potential witnesses or sources to harassment, intimidation, or coercion." Defs.' SMF ¶ 12 (quoting Hardy Decl. ¶ 19).

As the D.C. Circuit noted with respect to Exemption 7(C), if an agency "were required to acknowledge responsive documents in instances where there was no investigation but were permitted to give a *Glomar* response in cases where there had been one, it would become apparent that a *Glomar* response really meant that an investigation had occurred." *PETA*, 745 F.3d at 544. The same logic applies to Exemption 7(A) in the instant case: "The agency must be permitted to issue a *Glomar* response in both situations to maintain the uncertainty essential to *Glomar*'s efficacy." *Id.*; *see* Hardy Decl. ¶ 19 ("[A]ssuming that the FBI does not have any pending investigation on this subject, the FBI's Glomar response is nevertheless required, because if the FBI were to invoke a Glomar response only when it actually possessed responsive records, the Glomar response would be interpreted as an admission that responsive records exist, thus rendering it ineffective.").[9]

Accordingly, the FBI properly issued a *Glomar* response to the plaintiffs' Second Amendment Request, entitling the defendants to summary judgment on this aspect of the plaintiffs' claim.

## B. THE SECRET SERVICE PROPERLY WITHHELD RECORDS

In response to the plaintiffs' two FOIA requests to the Secret Service, the agency produced 268 pages of records with a number of redactions that the agency contends are justified by several exemptions. Only certain of the redactions under Exemptions 5 and 7(E) are disputed. Defs.' SMF ¶ 31; Pls.' Opp'n at 16 n.7; Defs.' Opp'n at 24 & n.10.[10] The plaintiffs argue that

---

[9]     Having resolved the sufficiency of the FBI's *Glomar* response to the Second Amendment Request on the basis of Exemption 7(A), the plaintiffs' vigorous challenge to the appropriateness of the FBI's invocation of Exemption 7(E) to this same request need not be addressed. *See Judicial Watch, Inc.*, 715 F.3d at 940 n.4 (having resolved propriety of withholding under Exemption 1, no need to "reach" "agency's alternative argument that some of the images could be withheld under FOIA Exemption 3"); *Larson*, 565 F.3d at 862–63 ("[A]gencies may invoke the exemptions independently and courts may uphold agency action under one exemption without considering the applicability of the other.").

[10]     Specifically, the plaintiffs dispute the redactions under Exemption 5 on bates-numbered pages 10, 101, 183, 210, 226, 229, 231, and 252, Defs.' Opp'n at 25 n.11; Campbell Decl. ¶ 11, and the redactions under both

the agency's explanations are too "general" to support these disputed redactions and suggest *in camera* review "to supplement the Secret Service's declaration." Pls.' Reply at 21–22. The Court has reviewed *in camera* unredacted copies of the pages at issue, along with a supplemental declaration, *see* Decl. of Brian S. Lambert, Special Agent in Charge, Protective Intelligence and Assessment Division, U.S. Secret Service, dated February 20, 2018 ("Lambert Decl."), to determine whether the redactions under Exemption 5 and Exemption 7(E) were appropriate. As explained below, beginning with consideration of the redactions under Exemption 5, the Secret Service properly withheld the disputed records.[11]

FOIA's Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Two conditions must be met for a record to qualify for this exemption and be withheld: "[1] its source must be a Government agency, and [2] it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *see also Nat'l Inst. of Military Justice v. U.S. Dep't of Def.*, 512 F.3d 677, 680 & n.4 (D.C. Cir. 2008). Exemption 5 may be used to withhold records subject to "the deliberative-process privilege, the attorney-client privilege, and the attorney work-product privilege." *Nat'l Ass'n of Criminal Def. Lawyers v. U.S. Dep't of Justice Exec. Office for U.S. Attys. & U.S. Dep't*

---

Exemption 5 and 7(E) on bates-numbered pages 135, 148–51, 156–58, 165–66, 168–69, 171, 174–75, 177, 179, 180–81, 185, 187, 189, 195, 208–09, 212–13, 228, 233–36, and 243, Defs.' Opp'n at 24 n.10; Decl. of Brian S. Lambert, Special Agent in Charge, Protective Intelligence and Assessment Division, U.S. Secret Service ¶ 10 n.1 (clarifying that certain disputed redactions were "subject to withholding under *both* Exemption 5 and Exemption 7(E), notwithstanding any implication in the Campbell Declaration that they were only subject to withholding under one of those two exemptions"). The Lambert Declaration was filed *in camera* as part of the Secret Service's *in camera* production of the pages at issue, and the portion of that Declaration cited here is unsealed.

[11]    The Secret Service's *in camera* production was also reviewed with consideration given to the Court's "affirmative duty" to consider whether the agency has produced all segregable, non-exempt information, *Elliott*, 596 F.3d at 851 (quoting *Morley*, 508 F.3d at 1123), and the Court concurs with the Campbell Declaration that "[n]o reasonably segregable nonexempt portions of the documents have been withheld," Campbell Decl. ¶ 21.

*of Justice*, 844 F.3d 246, 249 (D.C. Cir. 2016) (citing *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980)).

For the deliberative process privilege to apply, the materials must be "both predecisional and deliberative." *Mapother*, 3 F.3d at 1537. A document is predecisional if "it was generated before the adoption of an agency policy" and is deliberative if "it reflects the give-and-take of the consultative process." *Coastal States*, 617 F.2d at 866. Thus, Exemption 5 "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.* "Factual material that does not reveal the deliberative process is not protected by this exemption." *Morley*, 508 F.3d at 1127 (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984)). The D.C. Circuit has emphasized that "[t]he identity of the parties to the memorandum is important; a document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made." *Coastal States*, 617 F.2d at 868.

The defendants explain that the Exemption 5 withholdings on pages 10 and 101 cover "pre-decisional deliberations between subordinates and supervisors regarding how to respond (if [a]t all) to media inquiries concerning the public comments that are the subject of Plaintiffs' Second Amendment request." Campbell Decl. ¶ 11. Similarly, the defendants explain that the redactions on the remaining disputed pages "protect the deliberative process that was used to determine what particular course of criminal investigative or protective action, if any, was to be taken in response to the public comments that were the subject of both of Plaintiffs' FOIA requests," and similarly "contain the pre-decisional opinions and thoughts of a variety of Secret

Service employees . . . about how the Secret Service should respond (if at all) to potential threats or perceived threats to Secret Service protectees," which opinions and thoughts "played a part in the process by which specific decisions were made" in response. *Id.* ¶ 13; Lambert Decl. ¶ 10 n.1.

Review of the redacted text on each of those pages confirms that this material is indeed pre-decisional and deliberative, and protected from disclosure under Exemption 5. The redacted information "reflects the give-and-take of the consultative process," *Coastal States*, 617 F.2d at 866, as employees of the Secret Service "prepared for and participated in discussions with upper and lower level management about how the Secret Service should respond (if at all) to potential threats or perceived threats to Secret Service protectees," Campbell Decl. ¶ 13. While some of the redacted material is "'factual' in form," the D.C. Circuit has held that Exemption 5 is nonetheless applicable if that material "reflect[s] an agency's preliminary positions or ruminations about how to exercise discretion on some policy matter" or would "reveal an agency's or official's mode of formulating or exercising policy-implicating judgment," *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992) (Ginsburg, J.), and the redacted material meets that standard.

The redactions on pages 135, 148–51, 156–58, 165–66, 168–69, 171, 174–75, 177, 179, 180–81, 185, 187, 189, 195, 208–09, 212–13, 228, 233–36, and 243 were also justified under Exemption 7(E). This exemption protects law enforcement records for which disclosure "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The "requirement that disclosure risk circumvention of the law 'sets a relatively low bar for the

agency to justify withholding.'"[12] *Pub. Employees for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 204–05 (D.C. Cir. 2014) (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)). The D.C. Circuit has held that "[t]o clear that relatively low bar, an agency must demonstrate only that release of a document might increase the risk 'that a law will be violated or that past violators will escape legal consequences.'" *Id.* at 205 (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009)). "Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at 42 (quoting *Mayer Brown*, 562 F.3d at 1194) (alteration in original).

The Secret Service explains that the material redacted under Exemption 7(E) on pages 135, 148–51, 156–58, 165–66, 168–69, 171, 174–75, 177, 179, 180–81, 185, 187, 189, 195, 208–09, 212–13, 228, 233–36, and 243 "relate[s] to certain specific techniques that the Secret Service uses in order to both detect and investigate potentially threatening comments," as well as "internal analysis," the release of which "would reveal the techniques used" for threat assessment. Campbell Decl. ¶ 19; Lambert Decl. ¶ 10 n.1. According to the agency, release of the information "would offer would-be violators of the law a powerful road map," Lambert Decl. ¶ 11, which "would enable the targets of those methods and techniques to avoid detention and to develop countermeasures against the Secret Service's use of such methods and procedures," Campbell Decl. ¶ 19. This explanation "demonstrate[s] logically how the release of th[at]

---

[12] Despite some disagreement among the circuits as to whether the phrase "could reasonably be expected to risk circumvention of the law" applies only to "guidelines for law enforcement investigations," or to "techniques and procedures" as well, the D.C. Circuit "has applied the 'risk circumvention of the law' requirement both to records containing guidelines and to records containing techniques and procedures," noting that "given the low bar posed by the 'risk circumvention of the law' requirement, it is not clear that the difference matters much in practice." *Pub. Employees for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 204 n.4 (D.C. Cir. 2014).

requested information might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at

42 (quoting *Mayer Brown*, 562 F.3d at 1194). Examination of the disputed Exemption 7(E)

redactions confirms that this material was properly withheld.

In sum, the Secret Service has adequately explained the disputed redactions under

Exemption 5 and Exemption 7(E). Accordingly, the Secret Service's motion for summary

judgment is granted.

## IV.     CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted and

the plaintiffs' cross-motion for summary judgment is denied. An appropriate Order accompanies

this Memorandum Opinion.


Date: March 19, 2018


_____
BERYL A. HOWELL
Chief Judge